1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ALEXANDER FOX,

        Plaintiff,

  v.

BAKERY, CONFECTIONERY, TOBACCO
WORKERS and GRAIN MILLERS
INTERNATIONAL UNION, LOCAL NO. 24,
AFL-CIO, BAKERY, CONFECTIONERY,
TOBACCO WORKERS and GRAIN
MILLERS INTERNATIONAL UNION, AFL-
CIO, FELISA CASTILLO, an individual, and
RANDY ROARK, an individual,

        Defendants.

_____/

No. C 08-05737 WHA

**ORDER GRANTING
DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT**

**INTRODUCTION**

    In this civil action between a San Francisco baker and his union, defendants Bakery,

Confectionery, Tobacco Workers and Grain Millers International Union, AFO-CIO ("BCTGM

International"), Bakery, Confectionery, Tobacco Workers and Grain Millers International Union,

Local No. 24, AFO-CIO, and individual defendants Randy Roark and Felisa Castillo move for

summary judgment against plaintiff Alexander Fox.

    Six claims are at issue in this dispute: (1) breach of implied-in-fact contract; (2) breach of

the covenant of good faith and fair dealing; (3) wrongful termination in violation of public policy;

(4) retaliatory discharge; (5) intentional interference with prospective economic advantage; and

(6) conspiracy. These claims alleged — via two different theories — that plaintiff was wrongfully suspended by his union, removed from office, and rendered ineligible to run for office because he was "late" in paying his union dues. On summary judgment, this order holds as follows:

As to claims one, two, and five alleging that plaintiff's dues payments were *not late* under governing union rules, these claims are anchored in the union constitution and bylaws and preempted by Section 301 of the LMRA. Moreover, since the claims alleged the direct violation of a union constitution, they are untimely under the governing six-month statute of limitations.

As to claims three, four, and six alleging that defendants' actions were retaliatory and without procedural safeguards in violation of the LMRDA, the undisputed evidence shows that plaintiff was *in fact* late in paying his union dues and therefore properly disciplined under the union constitution and bylaws. The evidence further shows that this discipline was imposed by an automated, software-driven process that looked only at *when* dues were paid. Despite evidence of animus, plaintiff fails to show that the chain of events leading to his discipline was tainted by retaliatory intent, or that equitable estoppel and waiver should apply to his claims.

For these reasons, summary judgment for all defendants is **GRANTED**.

## STATEMENT

### 1. ALEXANDER FOX

Plaintiff Alexander Fox began working as a baker in San Francisco at the age of 18, and joined Local 24 — the local union of BCTGM International — in 1980 (Fox Decl. ¶ 2). In 1996, Fox's co-workers at Parisian Bakery of San Francisco elected him as their union representative (*id.* ¶ 3). Beginning in 1998, Fox also served on the executive board of Local 24 (*ibid.*). Three years later, Fox was elected to the union officer position of business agent, assuming office in February 2002 (Compl. ¶ 9; Fox Decl. ¶ 3). In 2004, Fox successfully won re-election as business agent, a position he held until his suspension from the union and removal from office in October 2007 (Compl. ¶¶ 13, 39–40; Fox Decl. ¶ 13). The circumstances and events surrounding his removal from office form the basis of this action.

2

## 2. STRUCTURE AND GOVERNING DOCUMENTS OF DEFENDANT UNIONS

BCTGM International is an international labor union with approximately 100,000 members in the United States and Canada (Durkee Decl. ¶ 3). All BCTGM International members belong to one of 164 local unions, each representing members in a particular geographic area or at a specific facility (*id.* ¶ 4). Both BCTGM International and its members are bound by its constitution. During the events underlying this dispute, the constitution provided that "[m]embership in the International Union constitutes an acceptance by each member to be bound by the provisions of the Constitution, the oath of membership and the laws, policies and directives of the International Union and the local union" (*id.* ¶ 5, Exh. A, Art. XIX, § 4(a)). The oath of membership in the union included the "promise . . . to maintain the Constitution of the International Union . . . and the Bylaws of this or any other Local Union . . . with which I may become affiliated" (Art. XIX, § 3). Additionally, the constitution mandated that "[e]very local union shall adapt Bylaws[,]" and that "[s]uch Bylaws and amendments thereto must be in accord with the Constitution of the International Union . . . ." (Art. XVI, § 5).

### A. LOCAL UNION OFFICER POSITIONS

The constitution authorized local unions to create elected offices necessary to carry out union functions (Art. XVI, § 9). Although the constitution did not regulate every aspect of the local officers' duties, it required that "[e]lections of local officers shall be consistent with the provisions of this Constitution and applicable law" (Art. XVI, § 12(a)). Under Local 24's bylaws, its officers were elected to three-year terms (Castillo Decl. Exh. A, Art. 6, § 1).

### B. UNION DUES

The constitution required the regular payment of union dues (Durkee Decl. ¶ 6).[1] Under its provisions, "[d]ues and assessments for each calendar month must be paid on or before the first day of the respective calendar month in order to avoid delinquency" (Art. XIX, § 5). It further specified that "[n]o dues shall be accepted by local unions unless all outstanding assessments uniformly required have first been paid in full by the member" (*ibid.*). In other

---

[1] Plaintiff's relevance and "lay opinion" objections to the Durkee Declaration are overruled. The evidence is both relevant and helpful to a determination of the issues herein.

1   words, payments were applied to the earliest month for which a member had unpaid dues (Yeager

2   Decl. ¶ 5).

3        Local 24's bylaws also set forth rules for the regular payment of union dues, and stated

4   that "[t]o remain in good standing, [the] dues payment for a particular month must be received in

5   the office on the last business day of the following month" (Art. 2, § 5).  *It should be noted,*

6   *however, that this rule pertained specifically to a member's "good standing" in the union, and*

7   *did not address when union dues were "due" or became "in arrears*."

8        Both the constitution and bylaws set forth penalties for the late payment of dues.  Under

9   the constitution, "[a]s soon as a member becomes delinquent in his/her dues, the member

10  becomes immediately subject to loss of employment opportunities and to discharge" (Art. XIX, §

11  6(a)).  Furthermore, the constitution stated that "[m]embers in arrears with dues and/or

12  assessments more than two (2) months shall be suspended by the local union to which they belong

13  as well as by the International Union.  Suspension shall mean loss of all local and International

14  Union privileges and benefits and of all rights to participate in local proceedings" (Art. XIX, §

15  6(b)).  Similarly, Local 24's bylaws declared that "[a]ny member in arrears with dues or

16  assessments equal to two months dues, shall be delinquent and held under suspension by this

17  Local Union" (Art. 2, § 4).  The bylaws further stated that "[a]ny delinquent member, even

18  though paying all dues and assessments, shall not be considered a member in good standing and

19  shall not be entitled to any Local privileges and/or benefits for a period of thirty days after

20  making such payment" (*ibid.*).  In other words, under the bylaws, once a union member lost his

21  "good standing," he could not regain it until thirty days *after* becoming current on his dues.

22       In order to be eligible for election as a local officer, the constitution required that a

23  candidate be "a continuously good-standing, dues-paying member of the International Union and

24  the local union for at least two continuous years next prior to election . . . ." (Art. XVI, § 11(a)).

25  Additionally, the constitution mandated that "[s]uccessful candidates for local office shall

26  continue to meet the requirements of good-standing membership as a condition to retaining the

27  office to which elected; failure to do so shall immediately terminate the term of office and the

28  local union shall arrange for the election of a successor" (Art. XVI, § 11(c)).

C.     PROCEDURES FOR PROCESSING UNION DUES

The constitution required local unions, "through their financial secretaries," to "send to the International Secretary-Treasurer their monthly membership and financial reports promptly after the last meeting of, or the close of, each month" (Art. XVI, § 6). According to the uncontested declaration of BCTGM Director of Finance Kurt Yeager, these "per capita reports" for a particular month contained information about the dues payments made by local union members in that month (Yeager Decl. ¶ 3).[2] These reports provided the *only* source of information regarding member dues payments to BCTGM (Durkee Decl. ¶ 10). BCTGM International then analyzed the data in the report for various purposes, including the calculation of member suspensions and expulsions based on the non-payment of dues (Yeager Decl. ¶ 4).

During the analysis process, if the data from the "per capita report" for any third month showed that a member's dues had only been paid through the first month, the software identified that member as being "two months in arrears" and designated him as suspended as of the first day of the fourth month (*id.* ¶ 6).[3] A BCTGM International Membership Coordinator then ran an "Edit Update" report to identify any local union *officers* suspended under the foregoing criteria (*id.* ¶ 7). An Officer Roster Clerk then prepared a form letter on behalf of International Secretary-Treasurer David Durkee to send to the local union's financial secretary, alerting the local union to the suspension of one of its officers and asking the financial secretary to advise BCTGM International if the suspension had been made in error (*id.* ¶¶ 8–9). Between 50 to 100 officer suspension letters were mailed each year to local unions (Durkee Decl. ¶¶ 9, 11).

**3.     PLAINTIFF'S NON-PAYMENT OF DUES AND REMOVAL FROM OFFICE**

In a 2002 precursor to the 2007 Main Event, Fox was suspended for delayed payment of his August 2002 union dues (*id.* ¶ 15, Exh. B; Fox Decl. ¶ 5). It turned out, however, that Fox's

---

[2] Plaintiff's objection to the admissibility of the Yeager Declaration is overruled (Dkt. No. 77). As will be made clear in this order, the information provided in the Yeager report is relevant to whether the alleged retaliatory conduct of defendants was, in fact, legitimate and non-retaliatory in nature.

[3] For example, if the per capita report for the month of September showed that a member had only paid his dues through July, the member would have been deemed "suspended" by the software program as of October 1.

1   payment — though tardy — was made just in time to avoid suspension and loss of good standing,

2   and a clerical error was to blame (Castillo Decl. ¶ 9, Exh. G; Fox Decl. ¶ 5). The records were

3   corrected and his suspension was erased (Castillo Decl. ¶ 9, Exh. H; Durkee Decl. ¶¶ 16, 17).

4   Since the 2002 event is really irrelevant to this dispute, no more ink will be spilled on it.

5       The Main Event in 2007, however, is the real story. In September 2007, Fox "returned

6   from vacation and realized that [he] was late in paying [his] July[] 2007 dues" (Fox Decl. ¶ 12).

7   The undisputed facts show that Fox made no payments during the month of August 2007 for his

8   July 2007 union dues (*ibid.*). Fox then paid his July 2007 dues on September 18, 2007, and his

9   August 2007 dues on September 28, 2007 (*id*. ¶ 12, Exhs. 1, 2).

10      The constitution — which all agree applied to all concerned — drew a sharp distinction

11  between the due date and the suspension of good standing, as follows:

12          *Due Date for Union Dues*: The constitution plainly stated that
            monthly dues were due on the first of the month. Thus, July dues
13          were due on July 1.

14          *Suspension and Loss of Good Standing*: The constitution plainly
            stated that a member who was more than two months in arrears
15          shall be suspended by the local union. Thus, if July dues were not
            received by September 1, the constitution required suspension.
16          Suspension resulted in a loss of good standing.

17      In other words, the sharp distinction was between the *due date* for union dues and the *date*

18  *of suspension and loss of good standing* (which directly affected a member's right to hold elected

19  office and run for office). Once a member missed a due date for a particular month, there was a

20  grace period to pay during which the member remained in good standing and avoided suspension.

21  The local bylaws went one step further and expressly required monthly dues payments to be

22  received by the last business day of the following month to avoid suspension and loss of good

23  standing. There is no other way to read these provisions.

24      Given these rules Fox should have paid his July 2007 dues by August 31 to avoid

25  suspension and loss of good standing. The undisputed facts, however, show that he did not pay

26  his July 2007 dues until September 18, 2007. As such, this was *unlike* the situation in 2002,

27  where Fox had actually paid his union dues within the good-standing grace period.

28

In mid-September 2007, Margaret Marez of Local 24 prepared the "per capita report" for August 2007. This report reflected the dues payment status of each Local 24 member as of September 1, 2007, and indicated that Fox's dues had only been paid through June 2007 (Marez Decl. ¶ 2; Yeager Decl. ¶¶ 14–15, Exh. B). The report was signed by Castillo on September 17, 2007, the day *before* Fox made his dues payment for July 2007, and was received by BCTGM International Secretary-Treasurer Durkee one week later (Yeager Decl. ¶ 13, Exh. A). It was then processed by BCTGM International's software on October 9, 2007 (*id.* ¶ 13). This processing revealed that as of the end of August 2007, Fox's union dues were two months in arrears (*id.* ¶¶ 14–15, Exh. B). The membership coordinator assigned to Local 24 then notified the official roster clerk of Fox's suspension on the same date (*id.* ¶ 13). Three days later, on October 12, Durkee sent Castillo a letter alerting her that Fox had been suspended for non-payment of dues as of September 1, 2007 (Durkee Decl. ¶ 18, Exh. E; Castillo Decl. ¶ 5).

On October 16, 2007, Local 24 held a scheduled executive board meeting. During the meeting, Castillo read aloud Durkee's October 12 letter to the board members in attendance and announced that as a result of his dues delinquency, Fox was disqualified as a candidate for elected office and would be removed immediately from his elected position as business agent (Fox Decl. ¶ 13; Castillo Decl. ¶ 6). The disqualification and removal were enforced, leading to this suit.

### 4. PLAINTIFF'S ALLEGATIONS OF RETALIATORY CONDUCT

Separate from his argument that his dues payments were timely, plaintiff alleges that the actions taken against him were retaliatory in nature and that the reasons given for his discipline were pretextual. The following facts form the basis of plaintiff's retaliation claims.

Sometime after being elected to the Local 24 executive board in 1998, Fox opposed a plan promoted by BCTGM International to merge Local 24 with nearby Local 125 (Opp. 8; Fox Decl. ¶ 15). According to Fox, his opposition to the merger was the first of many acts that made BCTGM International "mad" at him (*ibid.*). Shortly after assuming office as business agent for Local 24 in February 2002, Fox asked Local 24 Financial Secretary Felisa Castillo to institute a "check-off" system to automatically deduct union dues from officer paychecks. This request was denied (Fox Decl. ¶ 4). Later in 2002, as already mentioned, plaintiff was erroneously suspended

for non-payment of union dues (Durkee Decl. ¶ 15, Exh. B; Fox Decl. ¶ 5). Following this incident, Fox asked Castillo *again* to institute a "check-off" system. In response, Castillo allegedly told Fox that there would never be a "problem" (Fox Decl. ¶ 5). Fox then "quit worrying about the dues payments, confident that [Castillo] would remind [him] if [he] ever got to the point where there would be a 'problem'" (*ibid.*). Castillo does not dispute that she made these statements. She denies, however, telling Fox that she would allow him to serve as business agent if he were *legitimately* suspended for actual non-payment of union dues (Castillo Decl. ¶ 9).

As business agent, one of Fox's duties was to visit the Boudin Bakery at Fisherman's Wharf to inspect working conditions for the Local 24 members employed at the facility (Fox Decl. ¶ 7). At some point during Fox's tenure as business agent, Boudin Bakery closed for renovations and relocated its employees to Oakland. According to Fox, the bakery assured Local 24 members that they would be able to return to the Fisherman's Wharf facility and receive the same or higher wages once renovations were completed. Instead, Local 24 members were allegedly *not* allowed to return to the Fisherman's Wharf facility, and the reopened bakery was staffed with new hires at half the salary and benefits as the previous bakers (*ibid.*).

Fox asserts that the collective bargaining agreement governing this move was improperly negotiated by Castillo and BCTGM International's vice-president, Randy Roark, without the knowledge of (or input from) the two business agents of Local 24 (*id.* ¶ 8). Fox allegedly told Castillo that these actions were "not right," to which Castillo purportedly responded "shut-up" and that she and Roark "knew what they were doing" (*ibid.*). Fox continued to complain that the new CBA was unfair to labor, and was allegedly denied access to the Fisherman's Wharf facility by Boudin Bakery management when he attempted to inspect working conditions. Following this denial of access, Fox told Castillo that this was a breach of the CBA. He continued to complain thereafter. Eventually, Castillo arranged a meeting between Fox and the CEO of Boudin Bakery (*ibid.*). At the meeting, Fox was allegedly yelled at by Boudin Bakery's CEO, who told Fox that he was "out of [his] league" and that "things were going to be done [the CEO's] way" (*ibid.*). Fox then complained to Castillo about the disrespectful way the union was being treated, to which Castillo allegedly responded, "That's what happens when you get in International's way" (*ibid.*).

8

In October 2006, the *other* elected business agent of Local 24, Frank Valdez, retired halfway through his three-year term (*id.* ¶ 10). Castillo asked that the executive board support the candidacy of Joseph Biringer as Valdez's replacement. Fox, however, vocally objected to Biringer's candidacy, and told the board that a bilingual candidate would be better suited in the role of business agent. Fox believed that Castillo was angry that he did not support Biringer. Nevertheless, the board endorsed Biringer as business agent, and Castillo — exercising her power as financial secretary — appointed Biringer as Valdez's replacement (*ibid.*).

In July 2007, Biringer approached Fox and expressed interest in running for financial secretary, due to Castillo's announcement that she would be retiring at the conclusion of her term (*id.* ¶ 11). Biringer allegedly told Fox that he would *not* run for financial secretary if Fox was interested in the position. Fox then told Biringer that he *was* going to run for financial secretary (*ibid.*). Meanwhile, at or around this time, Local 24 member Jose Navarro approached Castillo at a union meeting and said to her, "Now that you are leaving, I guess that means Alex Fox will be taking your position" (Navarro Decl. ¶ 2). Castillo allegedly responded to this statement with, "over my dead body" (*ibid.*).[4]

As stated earlier, Fox was declared ineligible to run for office due to the determination by BCTGM International that his union dues were over two months in arrears (Castillo Decl. ¶ 6). According to Castillo, Fox was one of *three* Local 24 members declared ineligible for candidacy in the 2007 elections due to non-payment of union dues (Castillo Decl. ¶ 8, Exhs. C, D). After Fox's ineligibility was announced at the executive board meeting on October 16, 2007, Fox allegedly asked Castillo to postpone the nominating meeting for the 2007 elections, which was to occur immediately after the executive board meeting, so that he could prove that his union dues were current (Fox Decl. ¶ 14). Castillo allegedly replied "Absolutely not," and BCTGM International Vice-President Roark, who was supposedly standing nearby, said "I concur" (*ibid.*).

---

[4] Defendants' objection to the admissibility of the Navarro Declaration on the grounds that his contact information was not disclosed in plaintiff's initial disclosures under FRCP 26(a) is overruled (Dkt. No. 77). FRCP 26(a) only requires the disclosure of the address and telephone number of a disclosed individual *if known*. Plaintiff's counsel did not know the address or telephone number of Navarro at the time initial disclosures were made, and apparently never learned that information (Ryan Decl. ¶ 3).

Castillo then allegedly told Fox that he had 48 hours to clear out his office, and that if he complained, he would "never work in the baking industry or in any union" (*ibid.*).

According to Fox, he knew of no other Local 24 officers removed from office for non-payment of union dues (*id.* ¶ 17). Fox, however, fails to identify *any* union officer who had been legitimately suspended by BCTGM International (as he was) and was allowed to remain in or run for office. Fox also presents no evidence that any of the defendants manipulated the system used by Local 24 and BCTGM International to process dues payments and identify local union officers facing suspension. While the evidence presented by Fox would support a finding of animus, Fox presents *no evidence* connecting this animus to the events that led to his suspension.

\*                  \*                  \*

The instant action was filed on December 23, 2008. The complaint alleged six claims: (1) breach of implied-in-fact contract; (2) breach of the covenant of good faith and fair dealing; (3) wrongful termination in violation of public policy; (4) retaliatory discharge; (5) intentional interference with prospective economic advantage; and (6) conspiracy (Compl. ¶¶ 50–84).

Following the close of discovery, defendants BCTGM International and its vice-president, Randy Roark, moved for summary judgment on January 12, 2010 (Dkt. No. 66). That same day, defendants Local 24 and its former financial secretary, Felisa Castillo, also moved for summary judgment, joining in part with the majority of arguments presented by BCTGM International and Roark in their brief (Dkt. No. 61). Plaintiff filed a single opposition to both motions, and defendants filed timely replies (Dkt. Nos. 73, 75, 76). Numerous evidentiary objections were also raised by the parties.[5] A hearing was held on February 18, 2010.

**ANALYSIS**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c).

---

[5] Defendants' evidentiary objections to plaintiff's opposition were timely filed on February 4, 2010, the same day that their reply briefs were filed (Dkt. No. 77). Plaintiff, however, filed his evidentiary objections on February 11, 2010, *two weeks* after his opposition brief had been filed (Dkt. No. 81). The impact of this untimely filing is noted appropriately as evidentiary objections are addressed throughout this order.

An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party, and "material" only if the fact may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). In resolving a summary judgment motion, all reasonable inferences must be drawn in the light most favorable to the non-moving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

Defendants' dual motions present a multi-faceted attack on every claim asserted in the complaint. *First*, defendants argue that claims one, two, and five are preempted under Section 301 of the Labor-Management Relations Act (LMRA) because they require construction of the BCTGM International constitution and Local 24 bylaws, and are time-barred by a six-month statute of limitations (Int'l Br. 12–15). *Second*, defendants assert that even if not time-barred, these same three claims fail on their merits because the adverse actions taken against Fox were proper under the provisions of both the constitution and bylaws (*id*. at 15–18). *Third*, defendants argue that plaintiff's wrongful termination claim fails as a matter of law because the Labor-Management Reporting and Disclosure Act (LMRDA) does *not* require unions to implement procedural safeguards before disciplining members for non-payment of dues (*id*. at 18–19). *Fourth*, defendants assert that plaintiff's fourth and sixth claims — based upon allegations of retaliatory discharge — lack sufficient evidence to survive summary judgment (*id*. at 19–24).

## 1. THE LMRA AND CLAIMS ONE, TWO, AND FIVE

As stated, defendants contend that Fox's claims for breach of an implied-in-fact contract, breach of the covenant of good faith and fair dealing, and intentional interference with prospective economic advantage are preempted by Section 301 of the LMRA, 29 U.S.C. 185, and barred by a six-month limitations period (Int'l Br. 12-18). They further contend that, even if not time-barred, Fox cannot establish the wrongfulness of their conduct under the constitution or bylaws (*id.* 15-18). In response, Fox contends that his claims do not require construction of terms in either the constitution or bylaws because the interpretation of the dues provisions is not contested (Opp. 10). Additionally, Fox appears to contend that preemption under Section 301 only arises in actions for the enforcement of CBAs or actions in which a labor dispute could have

a potentially significant impact upon labor-management relations or industrial peace (*id.* 13-18).
As shown below, Fox's argument fails on both counts.

A.    INTERPRETATION OF UNION CONSTITUTIONS AND LMRA PREEMPTION

Courts have long recognized that "the preemptive force of [Section 301] is so strong that [it] completely preempt[s] an area of state law." *Ansley v. Ameriquest Mortgage Co.*, 340 F.3d 858, 862 (9th Cir. 2003) (citation and quotation marks omitted). As such, "any claim purportedly based on that preempted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Id.* at 861–62 (citation and quotation marks omitted).

Section 301 applies by its terms to "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations . . . ." 29 U.S.C. 185(a). Interpreting this statutory provision, the Supreme Court has held that "union constitutions are an important form of contract between labor organizations[,]" and thus fit directly within the framework of Section 301. *Wooddell v. Int'l Bhd. Of Elec. Workers, Local 71*, 502 U.S. 93, 101 (1991). In *Wooddell*, the Supreme Court squarely confronted the issue whether "under § 301(a) . . . the District Court had jurisdiction over [a] breach-of-contract suit brought . . . by a union member against his local union," and held that a union member *may* sue under Section 301 based on a theory that the union has acted contrary to its constitution or bylaws. *Id.* at 95, 99–100. Moreover, the Court noted that to hold otherwise could result in the same document — the union constitution — being "given different meanings [by state and federal courts] . . . ." *Id.* at 102.

In light of *Wooddell*, Fox's argument that Section 301 is limited to CBAs is plainly contrary to law. Indeed, *Wooddell* makes clear that suits based on CBAs are one of *two* statutory bases for a Section 301 action. "Suits for violation of contracts . . . between any such labor organizations" form the other basis. 29 U.S.C. 185(a). The BCTGM constitution and Local 24 bylaws are such contracts.[6] As such, if Fox's claims are grounded in, or require interpretation of,

---

[6] Fox's argument that a dispute must have a potentially significant impact upon labor-management relations or industrial peace in order for Section 301 to apply also fails (Opp. 15). Although the Ninth Circuit once adopted the rule that Section 301 "did not provide jurisdiction over a suit for breach of a union constitution if the controversy is related

12

the constitution or bylaws, they are preempted by Section 301. *See Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1060 (9th Cir. 2007).

B.  FOX'S CLAIMS AND THE INTERPRETATION OF THE BCTGM CONSTITUTION AND LOCAL 24 BYLAWS

Whether a "plaintiff['s] claim is either grounded in the provisions of the labor contract or requires interpretation of it" involves "an inquiry into whether the asserted cause of action involves a right conferred upon an employee by virtue of state law, not by [the labor contract]." *Burnside*, 491 F.3d at 1059. "If the right exists solely as a result of the [labor contract], then the claim is preempted, and [the] analysis ends there." *Ibid.* "If, however, the right exists independently of the [labor contract], [the court] must still consider whether it is nevertheless substantially dependent on analysis of a [labor contract]." *Ibid.* (citation omitted).

In his opposition, Fox does not identify *any* state law basis for his claim independent from the constitution and bylaws.[7] Nor does Fox argue that a separate contract (other than the constitution and bylaws) provides the basis for his implied-in-fact contract claim. Although Fox begins his opposition to defendants' preemption argument by contending that "this case does *not* require the Court to construe the terms of International's Constitution, or Local 24's Bylaws[,]" and ends it by arguing that "it is analysis of a calendar upon which [Fox's] claims will be 'substantially dependent[,]'" Fox essentially concedes in his brief that the terms of the constitution and bylaws govern his rights (Opp. 10, 18).

Indeed, one look at the operative complaint confirms that the "legal character" of his claims is derived directly from these labor contracts. See *Burnside*, 491 F.3d at 1060 ("[T]o

only to a union dispute which will not affect external labor relations," it *explicitly abandoned* that limitation in light of the Supreme Court's decision in *United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry v. Local 334*, 452 U.S. 615 (1981). *Kinney v. Int'l Bhd. of Elec. Workers*, 669 F.2d 1222, 1229 (9th Cir. 1982) (citations and quotation marks omitted).

[7]  In passing, Fox cites a California Supreme Court case, *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654 (1988), for the proposition that "under California law, a discharged employee may seek tort damages based on a claim that he was discharged in violation of a fundamental public policy" (Opp. 16). However, Fox does not raise a single argument as to how *Foley* applies to *this* action. Fox fails to identify a public policy that "inures to the benefit of the public at large rather than to a particular employer or employee[,]" or articulate how any such policy is "firmly established," "fundamental," "and substantial." *See Foley*, 47 Cal. 3d at 669, 670 n.11 (citation and quotation marks omitted).

determine whether a particular right inheres in state law or, instead, is grounded in a CBA, the Court has instructed us to consider the *legal* character of a claim . . . .") (citation and quotation marks omitted) (emphasis in original). The complaint alleged that Fox's election as a business agent to a "three-year term" occurred "as provided by Article XVI, Section 9 of the Constitution . . . and Articles 6 and 9 of the By Laws" (Compl. ¶ 9). In describing the events leading to his suspension for non-payment of dues, Fox alleged that "International accepted Plaintiff's payment of his July 2007 dues on September 18, 2007, and his August 2007 dues on September 28, 2007 . . . . *Under Local 24's Bylaws*, that is a timely payment of dues" (*id.* ¶ 30) (emphasis added). Moreover, in his descriptions of his first, second, and fifth claims, Fox asserts a deprivation of rights derived directly from the constitution and bylaws (*see, e.g.*, *id.* ¶ 51 ("Plaintiff was further assured by Article XVI, Section 12, subdivision (d) of International's Constitution that he would remain in office . . . ."), ¶ 52 ("Plaintiff . . . performed in accordance with the terms of the Agreement he had with Defendants, including the timely payment of union dues according to Local 24's Bylaws . . . ."), ¶ 56 (defendants "deprived Plaintiff of the benefits of their Agreement with him . . . ."), ¶ 71 ("Plaintiff had an existing relationship with Local 24 . . . .")).

Additionally, even if Fox's claims can be said to arise from an independent right conferred by state law, his arguments necessitate analysis of the constitution and bylaws because they are contingent upon whether his dues payments were *in fact* timely. As both parties conceded at oral argument, for a dues payment to be timely under the constitution, a member must pay his or her monthly dues on the *first* of the month (Art. XIX, § 5). Fox, however, insists that under the bylaws, a dues payment is timely if it is paid by the end of the *following* month. Ignoring for the moment whether the constitution's supremacy clause would trump any inconsistencies between its own dues provisions and those set forth in the bylaws, the bylaws say *nothing* about timeliness of dues. Rather, the bylaws state that *good standing* is lost if dues payments are not made by the end of the following month (Art. 2, § 5). As such, a proper determination of whether Fox's dues payments were *in fact* timely, and whether his termination was therefore improper, clearly rests on an interpretation of both the constitution and bylaws.

In sum, these three claims are preempted under Section 301 of the LMRA.

C.     THE STATUTE OF LIMITATIONS UNDER SECTION 301

Defendants contend that the National Labor Relations Act's six-month limitations period applies to Fox's preempted claims (Int'l Br. 14–15). *See* 29 U.S.C. 160(b) (providing a six-month limitations period for complaints based on unfair labor practices). This order agrees.

In *Moore v. Local Union 569 of the International Brotherhood of Electrical Workers*, 989 F.2d 1534 (9th Cir. 1993), the Ninth Circuit considered whether the Supreme Court's holding in *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151 (1983), which applied the six-month statute of limitations to "hybrid" Section 301 suits, also extended to actions arising *solely* under Section 301. *Moore*, 989 F.2d at 1541. The *Moore* decision involved two claims brought under Section 301 of the LMRA based on the theory that the international union breached a duty owed to the plaintiff under the union constitution. *Ibid.* The *Moore* court identified these claims as "*Wooddell* claims" because (as in *Wooddell*) the claims alleged a direct violation of a union constitution. Relying on dicta set forth in *DelCostello* that the Court's reasoning would also apply to actions "arising solely under § 301[,]" the Ninth Circuit extended the holding in *DelCostello* to *Wooddell* claims. *Ibid.* The *Moore* court further reasoned that the essence of the plaintiff's complaint against the union for violation of its own constitution "[wa]s that the union failed to act fairly on his behalf." *Id.* at 1542. As such, the Ninth Circuit determined that the six-month statute of limitations would be *especially* appropriate to such claims.[8]

Notably, Fox does *not* oppose the application of *Moore* to this dispute. Rather, Fox argues that his LMRDA claims are beyond the ambit of *DelCostello* (Opp. 23–24). Defendants, however, never raised a statute of limitations argument against plaintiff's LMRDA claims (Int'l Reply 3).

---

[8] Another line of Ninth Circuit cases suggests that "'straightforward' Section 301 suits alleging solely a breach of contract should be governed by the most closely analogous statute of limitations of the forum state." *Gen. Teamsters Union Local No. 174 v. Trick & Murray, Inc.*, 828 F.2d 1418, 1427 (9th Cir. 1987). In *General Teamsters Union*, a union brought a breach of contract claim against an employer alleging a breach of a CBA. *Id.* at 1419. The court pointed out that prior to *DelCostello*, the Supreme Court had held that suits *by a union* alleging a breach of a CBA are subject to the analogous state statute of limitations. *Id.* at 1423. Because the instant case involves *Wooddell* claims and *not*, as in *General Teamsters Union*, a claim by a union against an employer for violation of a CBA, *Moore* clearly governs the statute of limitations issue in this case.

Since it is undisputed that Fox's claims are based on his allegedly unlawful suspension and termination accrued on or about October 16, 2007, and Fox did not file this lawsuit until December 23, 2008 — more than 14 months later — defendants' motion for summary judgment with respect to claims one, two, and five must be **GRANTED**.

### 2. THE LMRDA AND CLAIMS THREE, FOUR, AND SIX

Fox's third, fourth, and sixth claims are predicated upon allegations of retaliation under the LMRDA. In his fourth claim, Fox alleged that his removal from his position as business agent for Local 24 and disqualification from running for financial secretary violated Sections 101(a)(1) and 101(a)(2) of the LMRDA (Compl. ¶ 64). 29 U.S.C. 411(a)(1), (a)(2). Related to these allegations, Fox's third and sixth claims alleged that he was entitled to procedural safeguards before he was "disciplined" by the union, and that defendants conspired in their retaliatory conduct against him (*id.* ¶¶ 59, 75–84).

As explained below, while Fox has provided evidence to support a finding of animus, he fails to present a triable issue whether defendants' legitimate, non-retaliatory justification for their actions — namely, that Fox was properly disciplined under the constitution and bylaws for his late payment of union dues — was either motivated or manipulated by retaliatory intent. Fox freely admits that his late dues payments were caused by his "return[ing] from vacation" in September 2007. Because of this admission, Fox cannot claim that his late payments were made in reliance on any statements made by defendants. As such, equitable estoppel cannot apply. Finally, Fox has presented no evidence to support his claim of waiver. Because of these deficiencies, these claims cannot survive summary judgment. These points are now covered in detail.

#### A. THE MERITS OF PLAINTIFF'S RETALIATION CLAIMS

Section 101(a)(1) of the LMRDA, under the caption of "Equal rights," declares that:

> Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

As explained by the Ninth Circuit in *Ackley v. Western Conference of Teamsters*, 958 F.2d

1463, 1473 (9th Cir. 1992), Section 101(a)(1) is "an anti-discrimination provision, pure and simple." Accordingly, to state a claim under Section 101(a)(1), a union member must allege a denial of rights accorded to other members.

There is a complete absence of evidence that plaintiff was treated differently with respect to his membership rights than his fellow union officers and members (Int'l Br. 20). Moreover, the undisputed evidence shows that (1) BCTGM International's determination of whether a union member was two months in arrears was based upon a mechanically prepared "per capita report" that was processed by a software program that *automatically* identified delinquent union members, and (2) Fox was one of *three* candidates disqualified from the 2007 elections pursuant to the above procedure (Castillo Decl. ¶ 8, Exhs. C, D; Yeager Decl. ¶¶ 3–9; Marez Decl. ¶ 2).

Plaintiff has produced no evidence that the preparation of these "per capita reports" by Local 24 or the operation of BCTGM International's software program resulted in his unequal or discriminatory treatment. The only evidence of purported "unequal treatment" provided by Fox is the declaration of a Local 24 *member* who, while working at a bakery, had his monthly union dues automatically deducted from his paycheck (Mayorquin Decl. ¶ 3). Union *officers*, however, did not have this "check-off" feature available to them, and Fox does not say that he alone was singled out and denied this benefit (Fox Decl. ¶ 4). As such, no competent evidence supports a claim that Fox was treated unequally, and no evidence shows that Fox was denied a benefit that other officers received. Additionally, Fox has produced no evidence to support his allegation that other officers were "excused" for late dues payments (Compl. ¶ 10).

Section 101(a)(2) of the LMRDA, entitled "Freedom of speech and assembly," sets forth:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

To state a claim of retaliation under Section 101(a)(2), a union member must allege facts

sufficient to show that: (1) he exercised the right to oppose union policies; (2) he was subjected to retaliatory action; and (3) the retaliatory action was "a direct result of his decision to express disagreement" with the union's leadership. *See Casumpang*, 269 F.3d at 1058. On these elements, the parties do not dispute that the complaint sufficiently stated a claim of retaliation under Section 101(a)(2). Rather, defendants argue that plaintiff has failed to substantiate his allegations with evidence sufficient to survive summary judgment. This order agrees.

In *Campusang*, the Ninth Circuit extended the traditional burden-shifting framework applicable to Title VII retaliation claims to LMRDA retaliation claims. *See Campusang*, 269 F.3d at 1058–59 (looking to the "related field of retaliatory actions . . . under Title VII of the Civil Rights Act of 1964" for rules governing LMRDA claims of retaliation). As such, defendants need only show a legitimate, non-retaliatory justification for their actions to shift the evidentiary burden to plaintiff. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). Fox must then "show that the alleged explanation is a pretext for impermissible retaliation . . . either directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 1377.

With respect to his *prima facie* case, plaintiff has presented sufficient evidence that he exercised his right to oppose union policies as a member and officer of Local 24. As an executive board member, Fox opposed the supposed "merger" of Local 24 and Local 125, and as business agent, he voiced opposition to the CBA governing union members working for Boudin Bakery. Fox also voiced his opposition to the appointment of Joseph Biringer as business agent.

Additionally, Fox has sufficiently shown that animus existed — it can be easily inferred from Castillo's statement that Fox would succeed her "over [her] dead body." Even so, Fox has failed to show that the adverse actions actually taken against him by defendants were influenced by, or were a product of, this animus. In other words, Fox has failed to show *any causal relationship* between animus that may have existed and the discipline he received.

While the complaint alleged that Fox was removed from office for various retaliatory reasons, such as failing to wear "shoes, slacks, and a button down shirt to work," for being popular with Local 24's members, and for exercising his right to oppose union policies, Fox —

with the full arsenal of discovery at his disposal — has produced no evidence substantiating these allegations (Compl. ¶¶ 14, 15, 63). Indeed, at his deposition, Fox admitted that his evidence of an improper motive to remove him from office was limited to what he "heard" from people whose identities he could not remember (Fox Dep. 156–164).[9] This leaves only two statements purportedly made by defendant Castillo that could be inferred as evidencing retaliatory intent: the statement mentioned in the prior paragraph and her comment to Fox after he was lectured by the CEO of Boudin Bakery that "[t]hat's what happens when you get in International's way."

Even assuming that this evidence of animus is sufficient to make a *prima facie* case of retaliation, defendants have put forth a legitimate, non-retaliatory justification for Fox's suspension, removal from office, and ineligibility to run for office: *his failure to pay his union dues under BCTGM International's constitution*.

Under the constitution, "[d]ues and assessments for each calendar month must be paid on *or before the first day of the respective calendar month in order to avoid delinquency*" (Art. XIX, § 5). Under a plain reading of this rule, Fox was delinquent under the constitution when he failed to pay his July 2007 dues by the first of that month. Also under the constitution, "[m]embers in arrears with dues and/or assessments more than two (2) months shall be suspended by the local union to which they belong as well as by the International Union" (Art. XIX, § 6(b)). The bylaws go a step further and require the payment (to avoid loss of good standing) by the last *business* day of the following month, to avoid claims that a member tried to pay when the office was closed.

As conceded at oral argument and in his opposition brief, Fox was late in paying his July 2007 dues, which he paid on September 18, 2007. That fact is undisputed. As such, Fox went "into arrears" as of July 2 and lost "good standing" at the end of August. When he finally paid his dues on September 18, he was already *not* in good standing. There is no other way to read the rules. Accordingly, Fox was properly suspended.

This suspension had the *immediate* effect of invalidating Fox's eligibility to run for local

---

[9]  Plaintiff's objections to the admissibility of Fox's deposition are overruled (Dkt. No. 81). These objections were not only untimely (with the exception of the two objections targeting defendants' reply briefs), but defendant properly authenticated the deposition excerpts in a subsequent filing. Plaintiff's objections that the deposition transcripts are incomplete are also overruled.

office as well as his right to retain his current office under the constitution (Art. XVI, § 11(a), (c)). As such, under a straightforward application of the constitution to the facts of this case, Fox's suspension, removal from union office, and disqualification from the 2007 election were proper.

Additionally, the process for determining whether Fox was two months in arrears was governed by the routine preparation of "per capita reports" by Local 24 and the use of software by BCTGM International. This process was used for all of BCTGM's 164 local unions. Given this backdrop, Fox has put forth *no evidence* showing that this process had not been followed, or that this process was anything but non-discretionary, mechanical, and automatic. Indeed, as stated earlier in this order, Fox was one of *three* election candidates disqualified for non-payment of dues. Moreover, the August 2007 "per capita report" was prepared on September 17, 2007, the day *before* Fox had even made the disputed dues payments. Thus, Fox cannot claim that the "per capita report" improperly excluded any of his payments, as had occurred in 2002. Moreover, even if the report had *included* Fox's September payments, BCTGM's software would have still flagged Fox for suspension. Given this evidence, defendants have more than met their burden of showing a legitimate, non-retaliatory reason for their actions.

The burden then shifts to Fox to show that defendants' explanation was mere pretext for unlawful retaliation. This he has not done. Fox has produced *no evidence* that the mechanical procedure followed by Local 24 and BCTGM International to identify delinquent union members was tainted by retaliatory intent, or that defendants' proffered explanation cannot be trusted. Additionally, none of the "disputed facts" raised in plaintiff's opposition are material to the resolution of these claims, because they do not bear on whether the actual chain of events leading to his discipline were motivated by retaliatory intent (Opp. 7–8). Again, the undisputed evidence shows that plaintiff paid his July 2007 dues on September 18, 2007. Under the constitution, plaintiff was two months in arrears for his July 2007 dues. Plaintiff was then flagged for being two months in arrears by BCTGM software. The software generated a form letter, which informed Local 24 of plaintiff's suspension. Under both the constitution and bylaws, plaintiff's suspension prevented him from holding elected office and running for elected office.

While defendant Castillo may have "had it in" for plaintiff, there is absolutely no evidence showing that she, or any other union official, played any role whatsoever in the chain of events leading to plaintiff's suspension. As such, Fox's fourth claim under the LMRDA fails, and defendants' motion for summary judgment on this claim must be **GRANTED**.

### B. EQUITABLE ESTOPPEL AND WAIVER

In his opposition brief, Fox makes a half-hearted argument that equitable estoppel and waiver should bar the application of the constitution to his dues payments, because Financial Secretary Felisa Castillo told him "not to worry" about late payments in 2002 and refused to institute a dues "check-off" system (Opp 9). This argument fails. *First*, no evidence shows that Castillo had a duty to institute a "check-off" system for the convenience of plaintiff. *Second*, Castillo's statement to plaintiff was made in 2002, when plaintiff had paid his dues on time and a reporting error was to blame for his suspension (Castillo Decl. ¶ 9). *Third*, no evidence shows that other officers were ever excused for late dues payments. *Fourth*, plaintiff admitted that he failed to pay his dues for July 2007 because he had been "on vacation" through September and "realized he was late" upon return. Thus, Fox admits that he did not actually rely on Castillo's 2002 statements (Fox Decl. ¶ 12). For these reasons, equitable estoppel and waiver do not apply.

### C. PLAINTIFF'S CONSPIRACY CLAIM

Plaintiff's sixth claim for conspiracy alleged that defendants "willfully, knowingly, oppressively, and maliciously conspired and agreed among themselves to terminate Plaintiff's employment with Local 24 for discriminatory and retaliatory reasons" (Compl. ¶ 75). In other words, plaintiff's conspiracy claim was predicated upon the same unlawful retaliatory conduct alleged in his fourth claim. "California does not recognize conspiracy as an independent tort." *Hyles v. Mensing*, 849 F.2d 1213, 1217 (9th Cir. 1988); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 992 (9th Cir. 2001). Because plaintiff failed to produce sufficient evidence to take his LMRDA retaliation claim to the jury, plaintiff's conspiracy claim — which takes life from this underlying "wrong" — must also fail. As such, defendants' motion for summary judgment on Fox's sixth claim for conspiracy must be **GRANTED**.

### D. PROCEDURAL SAFEGUARDS UNDER SECTION 101(A)(5)

Plaintiff's third claim alleged that defendants "terminated Plaintiff in order to prevent him from exercising his right as a member of the union to run for Castillo's vacated office, or for any office, but without compliance with the procedural safeguards of [Section 101(a)(5) of the LMRDA]" (Compl. ¶ 59).  Section 101(a)(5) states that "[n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined *except for nonpayment of dues* by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; [and] (C) afforded a full and fair hearing."  29 U.S.C. § 411(a)(5) (emphasis added).  As this order has made clear, Fox *was* delinquent on his union dues under the constitution, and his suspension, removal from office, and candidacy disqualification were a direct result of his nonpayment of dues.  As such, Fox was not entitled to procedural safeguards under Section 101(a)(5), and defendants' motion with respect to this claim must be **GRANTED**.

## CONCLUSION

For the reasons set forth above, plaintiffs' motions for summary judgment with respect to all six claims are **GRANTED**.  Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated:  February 24, 2010.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE